# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANTHONY A. PEARCE, | § | |
| | § | |
| **Plaintiff,** | § | |
| v. | § | CIVIL ACTION NO. |
| | § | |
| ANDREW SAUL, | § | SA-18-CA-1131-XR |
| Commissioner of the Social | § | |
| Security Administration, | § | |
| | § | |
| **Defendant.** | § | |

## ORDER

On this date, the Court considered the Report and Recommendation of the United States Magistrate Judge (docket no. 21), and Plaintiff's objections thereto (docket no. 22). The Magistrate Judge recommends affirming the Commissioner's decision denying benefits. After careful consideration, the Court will accept the recommendation and affirm.

## Introduction

Plaintiff seeks review and reversal of the administrative denial of his application for Disability Insurance Benefits (DIB). Plaintiff contends that the ALJ erred by failing to adequately take into account his migraines, failing to properly weight medical expert opinions, and failing to properly assess his subjective complaints.

## Administrative Proceedings

Based on the record in this case, Plaintiff fully exhausted his administrative remedies prior to filing this action in federal court. Plaintiff filed for DIB on October 1, 2015, alleging disability beginning July 9, 2015, the date of a fall at work with resulting concussion and traumatic brain injury. The Commissioner denied the application initially and on reconsideration. Plaintiff then asked for a hearing. A hearing was held before ALJ Sung Park on October 19, 2017. Plaintiff

appeared, represented by his attorney, and vocational expert Judith Harper testified. The ALJ issued a decision on May 10, 2018, concluding that Plaintiff is not disabled within the meaning of the Social Security Act. The Appeals Council concluded that no basis existed for review of the ALJ's decision. The ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g). Plaintiff filed this action seeking review of the Commissioner's decision on October 29, 2018.

<u>Analysis</u>

**A. Standard of Review and Burdens of Proof**

In reviewing the Commissioner's decision denying disability benefits, the reviewing court is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards in evaluating the evidence. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990). Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed. *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995). In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from reweighing the evidence or substituting its judgment for that of the Commissioner. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see also Villa*, 895 F.2d at 1021 (The court is not to reweigh the evidence, try the issues de novo, or substitute its judgment for that of the

Commissioner.). Conflicts in the evidence and credibility assessments are for the Commissioner and not for the courts to resolve. *Martinez*, 64 F.3d at 174. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience. *Id.*

Regulations set forth by the Commissioner prescribe that disability claims are to be evaluated according to a five-step process. 20 C.F.R. § 404.1520. A finding that a claimant is disabled or not disabled at any point in the process is conclusive and terminates the Commissioner's analysis.

The first step involves determining whether the claimant is currently engaged in substantial gainful activity. If so, the claimant will be found not disabled regardless of his medical condition or his age, education, or work experience. The second step involves determining whether the claimant's impairment is severe. If it is not severe, the claimant is deemed not disabled. In the third step, the Commissioner compares the severe impairment(s) with those on a list of specific impairments. If it meets or equals a listed impairment, the claimant is deemed disabled without considering his age, education, or work experience. If the impairment is not on the list, the Commissioner, in the fourth step, reviews the claimant's residual functional capacity (RFC) and the demands of his past work. If the claimant is still able to do his past work, the claimant is not disabled.

If the claimant cannot perform his past work, the Commissioner moves to the fifth and final step of evaluating the claimant's ability, given his residual capacities, age, education, and work experience, to do other work. If the claimant cannot do other work, he will be found disabled. The

claimant bears the burden of proof at the first four steps of the sequential analysis. *Leggett*, 67 F.3d at 564. Once the claimant has shown that he is unable to perform his previous work, the burden shifts to the Commissioner to show that there is other substantial gainful employment available that the claimant is not only physically able to perform, but also, taking into account his exertional and nonexertional limitations, able to maintain for a significant period of time. *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002). If the Commissioner adequately points to potential alternative employment, the burden shifts back to the claimant to prove that he is unable to perform the alternative work.

**B. Findings and Conclusions of the ALJ**

In the instant case, the ALJ reached his decision at step five of the evaluation process. At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity after the alleged onset of disability on July 9, 2015. At step two, the ALJ determined that Plaintiff had the following severe impairments: obesity, lumbar degenerative disc disease, cervical degenerative disc disease, left shoulder sprain, migraine headaches, neurocognitive disorder, major depressive disorder, and anxiety disorder. The ALJ found Plaintiff's hypertension, thyroid disorder, and B-cell lymphoma were non-severe.

At step three, the ALJ found that Plaintiff did not meet any listing impairments. With regard to Plaintiff's migraines, the ALJ found that Plaintiff failed to meet Listing 11.01(B) or (D) because he did not show he had migraines at least once a week for at least three consecutive months, despite adherence to prescribed treatment or that migraines occurred at least once every two weeks for at least three consecutive months, despite adherence to prescribed treatment, with marked limitations in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting or maintain pace; or adapting or

managing oneself.[1]

At step four, the ALJ found that Plaintiff had the RFC to lift 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk for up to two hours in an eight-hour workday, and sit for up to six hours in an eight-hour workday. The ALJ found that Plaintiff should avoid concentrated exposure to extreme cold, excessive noise, excessive vibration, and fumes, odors, dust, gases, and poorly ventilated areas. The ALJ found that Plaintiff can understand and follow simple instructions and directions; perform simple tasks with or without supervision; maintain attention/concentration for simple tasks; and regularly attend to a routine and maintain a schedule. The ALJ limited Plaintiff to occasional interaction with co-workers and supervisors, and no interaction with the public, and found that "[w]ork should be limited to simple tasks involving only simple, work-related decisions, with few, if any, work place changes." At step five, the ALJ determined that Plaintiff was unable to perform his past relevant work, but that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including lens inserter, eyeglass frames polisher, and final assembler. Accordingly, the ALJ found Plaintiff was not disabled at step five.

---

1 There is no Listing for migraines, but Listing 11.01 covers "neurological disorders." Listing 11.01(B) requires "Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C)" and Listing 11.01(D) requires " Dyscognitive seizures (see 11.00H1b), occurring at least once every 2 weeks for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); and a marked limitation in one of the following: 1. Physical functioning (see 11.00G3a); or 2. Understanding, remembering, or applying information (see 11.00G3b(i)); or 3. Interacting with others (see 11.00G3b(ii)); or 4. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 5. Adapting or managing oneself (see 11.00G3b(iv))."

### C.   Plaintiff's Allegations of Error

Plaintiff contends that the ALJ erred by (1) failing to adequately account for Plaintiff's migraines in the RFC; (2) failing to properly weight medical expert opinions; and (3) failing to properly assess Plaintiff's subjective complaints under SSR 16-3p. The Magistrate Judge rejected each of these alleged errors and recommends affirming the Commissioner's decision.

#### 1.   Plaintiff's Migraines

With regard to Plaintiff's migraines, Plaintiff contends that the ALJ failed to include limitations caused by Plaintiff's well-documented and severe impairment of migraine headaches. Plaintiff asserts that the ALJ recognized the migraines as severe, meaning that they would interfere with Plaintiff's ability to work, but then failed to include any resulting functional limitations, without explanation. Rather, the ALJ makes the sole observation that "on January 4, 2016, the claimant reported a decrease in the frequency of his headaches with medication." Tr. 39. But the notes from that visit state that Plaintiff's headaches had decreased from every day to 4 times a week and could last for as long as 3 days. Tr. 687, Tr. 1022. Therefore, Plaintiff contends, while it is true that there had been a decrease in the frequency of Plaintiff's migraines, this citation does not show improvement to non-disabling levels.

Further, Plaintiff contends, the VE indicated that during the first 90 days of a job there would not be any allowable absences or missed time at all, Tr. 70, yet the ALJ failed to address the fact that Plaintiff still had headaches more days of the week than not. Plaintiff asserts that it is clear throughout the record that, despite compliance with his multiple prescribed medications, he continued to experience migraines of such severity and frequency that they would result in both an absentee rate and time off-task that are well in excess of rates that the VE found to be work-preclusive. Plaintiff contends that the ALJ does not point to anything in the record to

contradict this evidence of the frequency and severity of Plaintiff's migraines, the ALJ provides no limitation in the RFC for the migraines, and the ALJ does not cite to any evidence that would indicate that Plaintiff would be able to sustain any kind of job for 8 hours a day, 5 days a week.

The Government contends that the ALJ properly addressed the limiting effects of Plaintiff's migraines by limiting him to less than the full range of sedentary work, and that Plaintiff relies on his own subjective complaints and testimony regarding his migraines to refute the RFC assessment, but the ALJ fully considered and discounted Plaintiff's subjective complaints. The Government notes that the ALJ considered "Plaintiff's many reports to his doctors that his headaches were improved with medication" and that an "ALJ may consider the effectiveness of treatment" and "[p]ain alleviated by medication is not disabling." The Government asserts that the ALJ agreed that Plaintiff's migraines and other impairments limited him to a highly restrictive sedentary RFC based, in part, on Plaintiff's headaches. The Government argues that, despite the restrictions, the headaches were not disabling because, to be disabling, pain must be "constant, unremitting, and wholly unresponsive to therapeutic treatment." *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988). The Government argues that substantial evidence, including Plaintiff's many reports, supports the ALJ's finding that his migraines improved with treatment and were not disabling.

The Government further contends that the ALJ relied on evidence that Plaintiff could perform certain activities of daily living like "shopping, picking up things off the counter, spending time with family, living with others, handling self-care and personal hygiene, watching television, caring for pets, walking to the mailbox and to the pool to get some exercise, and walking one-quarter of a mile with pain (Tr. 37, 39, citing 782-86)." The Government argues that Plaintiff's reported activities support the ALJ's RFC assessment and final decision.

The Government also asserts that there are numerous documented instances of Plaintiff's noncompliance with his medication prescription, which the ALJ did not ignore. The Government notes that the evidence shows that Plaintiff had run out of his migraine medicine when he was seen on July 28, 2016 (Tr. 823-27); January 29, 2017 (Tr. 782, 786) (out of metoprolol, but while he was on the metoprolol his headaches had improved and he felt that his memory and speech was also somewhat better); and April 26, 2017 (Tr. 994) (out of medicine for seven days). The ALJ also noted that Plaintiff "was again advised to obtain glasses to see if these would help with his headaches and visual issues" (Tr. 35). Laura Perez, M.D., pointed out that, twice, Plaintiff failed to follow her advice "to obtain glasses to see if they would help some with the headaches and visual issues" (Tr. 882), but Plaintiff cites nothing suggesting that he adhered to Dr. Perez's advice and obtained glasses. Thus, the Government argues, substantial evidence supports a finding that Plaintiff was not compliant with his prescribed treatment, refuting his claim that he had disabling headaches "despite compliance." The Government also asserts that the ALJ is not required to make a specific finding that Plaintiff can maintain employment, and since "Plaintiff has not shown his ability to maintain employment was compromised," a finding of Plaintiff's ability to maintain employment is subsumed in the ALJ's RFC determination.

The Magistrate Judge concluded that the ALJ did not commit reversible error when assessing Pearce's migraine headaches. In evaluating the limiting effects of Pearce's migraines, the ALJ observed that Pearce "reported a decrease in the frequency of his headaches with medication." The Magistrate Judge recognized that the ALJ cited only a progress note from January 4, 2016 noting that Pearce stated his headaches had decreased in frequency from daily to 4 times a week but could still last for 3 days. But the Magistrate Judge noted that Pearce's later medical records—which the ALJ cites in earlier portions of the opinion—reveal a greater level of

improvement than reflected in the January 4, 2016 progress note. For example, on April 5, 2016, Pearce stated that with medication, his headaches had reduced to 3 to 4 times per week and only lasted a few hours with less intensity than before. Tr. 34 (citing *id*. 691). Pearce's medication was subsequently increased, and by July 28, 2016, he reported that his headaches occurred only 2 times per week and were not as severe in intensity as before. *See id*. 35 (citing *id*. 695). Accordingly, the Magistrate Judge concluded that, in assessing Pearce's RFC, the ALJ properly considered the effectiveness of his migraine medication, as pain alleviated by medication is not disabling. *See Johnson v. Sullivan*, 894 F.2d 683, 686 (5th Cir. 1990).

The Magistrate Judge further noted that although Pearce reported that his migraines worsened a few months later in September 2016 and then again in April 2017, the record reflects that Pearce stopped taking his migraine medicine during this period. There is also no evidence suggesting that Pearce obtained glasses—a relatively easy treatment that Pearce's provider believed might further help reduce his headaches. *See* Tr. 35 (citing *id*. 882). The Magistrate Judge noted that the ALJ cited these various instances of non-compliance throughout his opinion, *see id*. 35-37, and properly took them into account when assessing Pearce's RFC. Accordingly, the Magistrate Judge rejected Pearce's argument that "the record is clear that, despite compliance with his multiple prescribed medication, he continued to experience migraines th[at] . . . were of such severity and frequency that they would result in both an absentee rate and time off-task that are well in excess of rates the VE [vocational expert] found to be work-preclusive."

The Magistrate Judge further found that the ALJ properly accounted for functional limitations resulting from the migraines by including restrictions to avoid excessive noise and assessing less than the full range of sedentary work. Further, the Magistrate Judge noted that none of Plaintiff's record citations address whether his migraines would result in absenteeism or time

off tasks. *See, e.g., Vereen v. Barnhart*, No. 05-10, 2005 WL 3388139, at *5 (W.D. Tex. Nov. 16, 2005) (noting, "the plaintiff bears the ultimate burden of establishing that a specific diagnosed condition imposes actual exertional or non-exertional limitations"). The Magistrate Judge further concluded that the ALJ did not err in failing to specifically identify evidence that Plaintiff could keep a job on a sustained basis, as the ALJ's determination that Pearce was not disabled and therefore could maintain employment is subsumed within the ALJ's RFC determination. *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005).

In his objections, Plaintiff contends that the Magistrate Judge improperly "fill[ed] in the gaps left by the ALJ's own insufficient explanations and failed to recognize that the ALJ made multiple inferences that were not supported by substantial evidence." Citing *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision"). Plaintiff asserts that the ALJ provided only a single sentence of explanation regarding Plaintiff's migraines, referring solely to the visit in January 2016. The remainder of the Magistrate Judge's discussion of the evidence was not evidence that the ALJ discussed in support of his conclusions, but was instead part of the ALJ's summary of the evidence. Plaintiff contends that merely summarizing the evidence, even in great detail, does not substitute for an explanation as to how the ALJ reached his specific conclusions.

Moreover, Plaintiff contends, the Magistrate Judge's attempt to provide a *post hoc* rationalization for the ALJ's conclusions is flawed because although the Magistrate Judge referenced a statement that Plaintiff's migraines were "a little better" with an increase in his medication, this is not the same as cured with a lack of disabling symptoms. Plaintiff argues that neither the ALJ nor the Magistrate Judge adequately confront the evidence of Plaintiff's continuing migraines.

10

Plaintiff further contends that the Magistrate Judge erred by finding that the ALJ based his decision in part on Plaintiff's noncompliance in taking medications or obtaining eyeglasses, as there is no indication that the ALJ believed Plaintiff was non-compliant or utilized it as a basis for his findings. Plaintiff further asserts that limiting him to sedentary work and avoiding excessive noise does not fully account for his migraines, and that the ALJ supposedly included the limitation to avoid excessive noise in response to evidence that Plaintiff's headaches are provoked by light as well as sound, but the ALJ did not include any light exposure restrictions.

Plaintiff argues that he continues to suffer from migraines that are of such severity and frequency that they would result in both an absentee and time-off-task rate that are well in excess of the rates the VE found would be work-preclusive. Plaintiff contends that, because the ALJ never explores this is in his decision beyond a single flawed sentence, this Court should remand with instructions that the ALJ more adequately address how Plaintiff's migraines were accounted for in the RFC or else explain why they were not.

Plaintiff is correct that the ALJ's analytical discussion of Plaintiff's migraines, and his citation to only one medical note in his analysis, is lacking. However, "procedural perfection in administrative proceedings is not required" as long as "the substantial rights of a party have not been affected," and this Court must conduct a harmless error review. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007). In doing so, the Court examines whether the ALJ's decision is supported by substantial evidence.

Plaintiff's headaches are well documented in his medical records. Medical records indicate that Plaintiff suffered loss of consciousness in his fall on July 9, 2015, with subarachnoid hemorrhage on CT scan. Tr. 406. Shortly after his brain injury, Plaintiff complained of "intense headaches that last all day" with "sensitivity to light and sound." Tr. 362 (7/28/2015, "daily

headaches are rated at about 6/10"; "headaches were described as . . . shooting pain into and around his neck area")), Tr. 354 (8/2/2015, "came in early due to headache"), Tr. 336 (8/11/2015, "continues with intense headaches that last all day"). On July 28, Dr. Perez noted the headaches as "part of the postconcussive syndrome." Tr. 363. Plaintiff was diagnosed with "headaches" on August 11, 2015 and was prescribed metoprolol. Tr. 333. Plaintiff complained of "headache persist[ing] throughout the day with changing intensity" on August 25, 2015. Tr. 323. Dr. Perez stated she was increasing his metoprolol. *Id.* On August 31, 2015, Dr. Perez wrote, "he does tell me the metoprolol is helping his headaches at a higher dose." Tr. 316, Tr. 983.

On September 9, Plaintiff was seen by Dr. Siddiqi at Premier Pain Consultants. Notes state that Plaintiff "presents with headache, memory loss, numbness, and stiff neck" and that Plaintiff reported almost daily headaches since his injury. Tr. 379. The notes state, "location is primarily left temporal. The pain radiates to the left side of the face. He characterizes it as severe and sharp. Associated symptoms include stiff neck. The headache is exacerbated with exposure to bright light and loud noises. He has not found anything that lessens the headache." *Id.* Dr. Siddiqi ordered brain imaging and started Plaintiff "on preventive medication for headache." His notes say, "Topamax 25 mg twice daily will be started. He'll be started on Imitrex 100 mg one tablet at the onset of headache for breakthrough pain to abort the acute attacks." Tr. 380.

Plaintiff saw Dr. Perez on September 14, 2015. Notes state, "He has seen neurology and per wife, he had a CT ordered, but this was denied by the adjuster. He was also prescribed Maxalt(?) and Topamax, but was not able to fill them. I discussed with them that these medications are not on the formulary for work comp. They tell me the current working diagnosis with the neurologist is Migraines and post concussive syndrome. He is having severe daily headaches. The hydrocodone did not help. Tramadol helps more. He does have an appt with Dr. Connolly

12

(neuropsych) on the 24th." Tr. 968. On September 17, 2015, Plaintiff underwent a brain CT scan, and the results were found to be "negative" for abnormalities. Tr. 329.

On October 13, 2015, Plaintiff reported to Dr. Bales that "he still has trouble with word finding and migraine headaches." Tr. 489. Dr. Bales found that Plaintiff had not yet reached maximum medical improvement as he still needed to complete physical therapy and his neurocognitive function tests had not completely returned to baseline. Tr. 493. His anticipated date of maximum medical improvement was July 13, 2016. *Id.* Dr. Bales noted that if Plaintiff returned to work, job requirements may need to be redefined to accommodate residual physical or mental deficits from head trauma. Tr. 494.

Plaintiff saw Dr. Perez on October 21, 2015. Notes state, "He has also seen the neurologist and is currently being treated for now chronic migraines. His CT head did not show any lesions. He has had an EEG done. He was to be started on Topomax however this was not an approved medication through workmen's comp and has been switched over to Elavil." Tr. 951.

Plaintiff saw Dr. Perez on November 10, 2015. Notes state, "The patient presents for early followup due to a rapid change in speech, confusion, and memory issues. He states they have worsened this week. He states his headaches have also worsened. He is taking Imitrex, but this is only helping intermittently. . .   Of his current medications for his chemotherapy, the Rituxan is the only one that typically causes problems with headaches. The patient does state that he has tried to obtain the metoprolol, however was told by the pharmacist that this prescription had not been called in. Per our records, he did have a prescription called in in September with three refills for the metoprolol." Tr. 944. Additional notes state, "The patient's headaches are described as shooting pains from the anterior parietal region to the posterior parietal region on the left. This was his previous headache; now they are biparietal." *Id.* The treatment plan included refilling the

13

metoprolol and follow-up with neurology. *Id.*

Plaintiff saw Dr. Perez on December 1, 2015. Notes state, "The patient is taking Elavil and has metoprolol which do help with headaches; however, he does not feel that the Imitrex has helped with his headache. With further discussion, he stated that is not taking it at the onset of his headache. . . . He will start taking Imitrex at the onset of his headaches to see if this does relieve his symptoms." Tr. 935.

On December 29, 2015, Plaintiff saw Sean Connolly, Ph.D., a psychologist, for a neuropsychology evaluation. The doctor's notes state, "He indicated that he has had headaches, involving chronic migraines, and has been prescribed medication for these. He takes Imitrex 'when they are very bad.'" Tr. 509. He also noted that Plaintiff reported "over-sensitivity to light and sound." Tr. 510. Dr. Connolly found "evidence of neuropsychological dysfunctioning associated with higher cortical processes of the frontal lobes." Tr. 516.

Plaintiff saw Dr. Siddiqi on January 4, 2016 for a follow-up visit. Tr. 687. He presented with headache, memory loss, and numbness. Dr. Siddiqi's notes state,

> He states that his headaches [have] decreased in frequency from every day to 4 times a week headache. The headache can last for 3 days. This is generalized throbbing pain which is provoked by light as well as sound. His sleep is interrupted. He takes Elavil 25 mg daily at bedtime for prevention of migraine. He takes Imitrex 100 mg tablets at the onset of headache. [He] denies side effects of these medications.

Tr. 687. Other notes from that visit indicate that since Plaintiff's injury, "he had almost daily headaches" and "location is primarily left temporal. The pain radiates to the left side of the face. He characterizes it as severe and sharp. Associated symptoms include stiff neck. The headache is exacerbated with exposure to bright light and loud noises. It is improved with Imitrex." *Id.* Dr. Siddiqi's "assessment," states "chronic post-traumatic headache. Minimal improvement." Tr. 689.

He noted, "Continue with Imitrex 100 mg tab at the onset of headaches to abort acute attacks" and "Schedule a follow-up visit in 3 months." *Id.* Tr. 689-90. The "primary diagnosis" states, "Headache. Migraine without aura, not intractable, without status migrainosus." Tr. 690.

Plaintiff saw Dr. Perez on January 19, 2016. Tr. 921. Notes state, "He has been seen by the neurologist, also about two weeks ago, and his Elavil was increased due to the fact that he has continued to have migraines about four to five times a week with the pain lasting anywhere from one to three days. He has not been able to increase the dosage, however, until today as he has just received approval from Workmen's Comp for the new dose." Tr. 925. Dr. Perez referred Plaintiff to the ophthalmologist and for physical therapy and was waiting on the neuropsychologist's report. *Id.* Plaintiff saw Dr. Perez on February 16, 2016. Tr. 910. Visit notes state, "He does tell me that his migraines have improved with increased dose of the Elavil." Tr. 914. Dr. Perez also refilled the metoprolol. *Id.*

Plaintiff attended a follow-up visit with Dr. Siddiqi's nurse practitioner on April 5, 2016. Tr. 691. Notes state,

> Seen patient for a follow-up visit for headaches. States he is still getting headaches about 3-4 times per week. He had noted some improvement with Increase of Elavil to 50 mg tab at HS. Takes Imitrex at onset of headaches, and states although the headache can still last a few hours, it's not as severe in intensity as before. Overall, his headaches have decreased in frequency and intensity. Describes headaches as throbbing pain which is provoked by light as well as sound.

*Id.* The "assessment" again states "Chronic post-traumatic headache. Minimal improvement" with a plan to schedule a follow-up visit in 3 months. Tr. 693. The nurse practitioner "refilled Imitrex 100 mg tab at the onset of headaches to abort acute attacks; #9 tabs per month." *Id.*[2]

---

2 Plaintiff saw Dr. Yuan, a neurologist, on September 7, 2016 to determine if he had reached maximum medical improvement, impairment rating, and extent of injury. He noted that Plaintiff complained of headache, vertigo, tinnitus, memory difficulty and hearing loss, and that ENT, neurology, and psychology evaluation and treatments were

Plaintiff saw Dr. Perez on April 20, 2016 and the notes state "migraines." Tr. 901. Her notes also state, "He continues with intense migraines and has recently seen neurology. His Elavil has been increased to 50 mg." Tr. 905. On June 2, 2016, Plaintiff saw Dr. Perez for increasing episodes of lightheadedness and visual blurriness, with worsening of speech and memory issues. Tr. 882. Dr. Perez's notes state, "I have asked him twice to obtain glasses to see if that would help some with the headaches and visual issues." *Id.* Dr. Perez referred Plaintiff to an ENT and vestibular rehabilitation. Tr. 878. Plaintiff had a hearing test and evaluation at Ear Institute of Texas on June 16, 2016. Tr. 846. He was recommended a migraine diet and referred for further testing and follow-up. Tr. 870.

Plaintiff had his next follow-up visit with Dr. Siddiqi on July 28, 2016. Tr. 695. Dr. Siddiqi's notes state, "HEADACHE ARE A LITTLE BETTER. MEMORY STAYS THE SAME." *Id.* They further state, "States he is getting headaches about 2 times per week. He had noted some improvement with increase of Elavil to 50 mg tab at HS. Takes Imitrex at onset of headaches, and states although the headache can still last a few hours, it's not as severe as before. Overall, his headaches have decreased in frequency and intensity." Other notes state "positive for photophobia (with headaches)." *Id.* The treatment plan was to continue current medications (refilled Imitrex at onset of headaches to abort acute attacks; #9 tabs per month) and schedule a follow-up visit in six months. Tr. 697. Plaintiff also had a visit with Dr. Perez on July 28, 2016. Tr. 838. Notes state, "Patient has seen ENT. He was told that his visual input and inner ear input do not match, therefore leading to dizziness and subsequent migraines. He is being referred for vestibular rehab. Notes from ENT are still pending. He saw Dr. Siddiqi today. Mr. Pearce had a migraine and he was provided with medication in the clinic." Tr. 842.

---

in process, such that MMI had not been reached but was anticipated on December 31, 2016. Tr. 804, Tr. 850.

Plaintiff saw Dr. Perez on September 29, 2016. Notes state, "migraines worse once metoprolol ran out." Tr. 823. Other notes state, "He tells me that this last month metoprolol has not been approved by the insurance company and he has weaned himself off the medication. He tells me that during the last three weeks his migraine intensity has become more frequent and more intense and now the headaches are awakening him from sleep." Tr. 824. Dr. Perez noted that Plaintiff appeared to be grimacing due to a current migraine and that she had "rewritten for him to have metoprolol for his migraines as this is treating his headaches adequately. Although it is not completely taking the headaches away, it did certainly decrease the frequency and intensity of headaches." Tr. 827. On November 10 and November 30, 2016, records indicate he continued to take metoprolol at 25 mg. Tr. 676, Tr. 681.

Plaintiff saw Dr. Perez on January 29, 2017. Notes state "Metoprolol – helped memory/speech – headache." Tr. 782. The diagnoses were "head injury" and "migraines." *Id.* Dr. Perez wrote that Plaintiff was unable to work until January 29, 2018 due to "dizziness, memory issues, inability to drive." Tr. 783. She did not include headaches or migraines as a basis for his inability to work. Dr. Perez's notes from the visit state that "[h]e is out of metoprolol, however he does state that while he was on the metoprolol his headaches had improved and he does feel that his memory and speech were somewhat better while he was on the medication." Tr. 786. Dr. Perez refilled his metoprolol, noting, "I do feel that this is beneficial in regards to his migraines." *Id.*

Plaintiff saw Dr. Siddiqi on April 26, 2017. Tr. 994. Notes state, "Patient states that he ran out of this medication [Elavil]. He has not [been] taking his medication for the past 7 days. He has been having severe headaches since then. He takes sumatriptan [Imitrex] on as-needed basis for breakthrough headache. These 2 medications are working very well. . . . States he is getting headaches about 2 times per week. He had noted some improvement with increase of Elavil to 50

17

mg tab at HS. Takes Imitrex at onset of headaches, and states although the headache can still last a few hours, it's not as severe as intensity as before. Overall, his headaches have decreased in frequency and intensity. Describes headaches as throbbing pain which is provoked by light as well as wound." Tr. 994. The plan was to continue current medications and schedule a follow-up in six months. Tr. 996. The Imitrex was refilled at 9 tabs per month. *Id.*

Records from June 7, 2017 include headache in the list of Plaintiff's self-reported symptoms. Tr. 768. Dr. Perez indicated that Plaintiff could not return to work at that time and for at least six months due to "dizziness, confusion, inability to drive," again not listing headaches. Tr. 769. The plan following that visit was "continue with the current medications he is taking, including the metoprolol as a migraine prevention." Tr. 770.

The record contains a July 14, 2017 letter indicating that the workers' compensation insurer was accepting "post concussion headaches/migraines" as a compensable injury. Tr. 773. That record also indicates that the workers' compensation evaluator certified that Plaintiff reached maximum medical improvement on December 21, 2016 with a 14% permanent impairment rating. Tr. 774, Tr. 779 (exam date March 24, 2017). The evaluator's notes state that Plaintiff noted headaches and migraines, and was on metoprolol for headaches. Tr. 814.

Thus, the existence of Plaintiff's headaches is well established in the objective medical records. What is missing, however, is evidence of the functional limitations resulting from those headaches when Plaintiff is taking his prescribed medication. A review of the medical evidence indicates that, when Plaintiff was taking his prescribed medication, he was having headaches about two times per week, and they could still last a few hours, but were not as severe as previously. Tr. 691, Tr. 695, Tr. 994. There is no indication about how severe they were typically, how often they would last "a few hours" versus a brief time, or how they might affect Plaintiff's functional

capacity, absenteeism, or time off task at work.

On January 4, 2016, Plaintiff described the headaches as general, throbbing pain, improved by taking Imitrex at onset. Although headaches "could last a few hours," there is no indication of how frequently that occurred, nor is there evidence concerning how the headaches, if not relieved at onset by Imitrex (or how frequently that occurred), would cause Plaintiff to be absent or off-task or otherwise prevent Plaintiff from working. There is no objective medical evidence from any of Plaintiff's providers stating that his migraines or headaches, when properly treated, would cause absenteeism, time off-task, or otherwise prevent him from working.[3]

Plaintiff's testimony does not provide any further illumination. When asked why he would be unable to return to his prior work, Plaintiff listed various reasons, but did not mention headaches. Tr. 59. The only other testimony he offered was, "I'm not taking any pain medicine. They [workman's comp] denied all of that. My migraines – get migraines pretty regular. They quit approving my migraine medicine, but my doctor told me I had to have it. I can't stop the Elavil. So I pay for that out of pocket. Otherwise, I get real bad migraines." Tr. 62. Plaintiff provided no other testimony about his headaches or any absenteeism or functional limitations resulting from his headaches, including how they would affect his attendance or his time off task at work. Without such evidence, the Court cannot find that the ALJ's RFC is erroneous, beyond the fact that the ALJ included limitations on loud noises but not bright lights. However, Plaintiff fails to show that this error was harmful, as he does not provide evidence or argument that any of the available jobs the ALJ found Plaintiff could do would involve exposure to bright lights that would trigger disabling

---

3 There is also evidence that his primary care doctor had suggested he get glasses to see if they might further alleviate some of the headaches, but there is no indication that Plaintiff has done so. Even ignoring the possibility of glasses improving symptoms somewhat, Plaintiff's evidence fails to demonstrate that the headaches, when treated as prescribed, would limit Plaintiff's ability to work or to sustain employment beyond that found by the ALJ.

headache. Thus, on this record, the Court must affirm.

### 2. **Medical expert opinions of Dr. Connolly and Dr. Gerwell**

Plaintiff argues that "[t]he ALJ gave little or only partial weight to every medical opinion in the record and provided an RFC that was based instead upon his own lay interpretation of the medical evidence, contrary to two examining experts." Plaintiff further argues that the ALJ provided almost no explanation for giving little weight to the two opinions of neutral consultative psychological examiners, Dr. Connolly and Dr. Gerwell.

The Government contends that "[w]hat [claimant] characterizes as the ALJ substituting his opinion is actually the ALJ properly interpreting the medical evidence to determine his capacity for work" and the ALJ bears the ultimate responsibility for determining a claimant's RFC. The Magistrate Judge found that the ALJ performed an extremely thorough review of the medical evidence, explaining why he gave little weight to Dr. Connolly's opinion and partial weight to Dr. Gerwell's opinion and why he disagreed with the other state agency consultants, and did not commit reversible error.

Dr. Connolly

The ALJ summarized Dr. Connolly's report in detail at Tr. 31-32. The ALJ expressly considered Dr. Connolly's report in his analysis, Tr. 40, but found it was "not supported by objective test results, and thus is assigned little weight." The ALJ stated that Plaintiff "was able to complete testing without difficulties, and results showed moderately good attentiveness to auditory and visual details" as well as "good concentration and immediate memory." *Id*. The ALJ concluded, "The evaluator's opinion is partially consistent with the finding that the claimant can perform simple work and make simple work-related decisions." Tr. 41. The ALJ also noted that although Plaintiff complained of problems with concentration, he was able to watch television,

handle his own medical care, and the records indicated that he was able to complete the testing to assess his concentration and attention. Tr. 27.

The Magistrate Judge noted that the severity of Dr. Connolly's assessed limitations was contradicted by objective tests and observations made within his report. Although Dr. Connolly found during an attention performance test that Plaintiff measured well within the range of individuals independently diagnosed with ADHD/ADD and the data indicated marked difficulties with overall attention, he also observed that Pearce was "reasonably attentive to tasks and was able to focus concentration and did not need repetition of items or redirection. He did not seem particularly distractible in the testing situation." Tr. 512; *see also* Tr. 511 (during mental status exam, he was "able to focus attention on the task at hand"). And Pearce's performance on the Wechsler Adult Intelligence Scale-IV ("WAIS-INV") indicated "moderately good attentiveness to auditory details" and "good attentiveness to visual details." Tr. 512. Accordingly, Dr. Connolly noted that "[o]verall, the data would indicate moderately good attentiveness to auditory and visual details." *Id.* However, Plaintiff's score on the TOVA, a "visual continuous performance test," resulted in a score "well-within the range of individuals independently diagnosed with ADHD/ADD" and "would indicate marked difficulties in overall attention." Tr. 512. On this test, "his greatest struggles are in the area of attentiveness." *Id.*

When discussing Plaintiff's intellectual functioning, Dr. Connolly found his score to place him in the average range. Tr. 512. Dr. Connolly also noted that Plaintiff's working memory index score, which "involves attention, concentration, mental control, and reasoning," showed "good concentration and immediate memory, math concepts, and some mild deficits in alpha-numeric sequencing with dual concept tracking." Tr. 513-14. Although Dr. Connolly found evidence of frontal lobe involvement, he noted that individuals with frontal lobe involvement do well on most

of the structured tasks of neuropsychological testing, including the structured tasks of the WAIS-IV, and their deficits become much clearer on tasks that involve a range of executive functions, absence of structure or guidance, and relying on personal initiative.

Dr. Connolly found evidence of neuropsychological dysfunctioning associated with higher cortical processes of the frontal lobes, including executive functions of the frontal lobe, higher level analysis and problem solving, processing abstractions and concepts, as well as concentration, focusing and maintaining attention. He opined that Plaintiff would have difficulty with such things as multi-tasking, the acquisition, retention, and retrieval of new knowledge, performing timed and speeded tasks, coping with being rushed or pressured for performance, speed, or productivity, and coping with interruptions. Tr. 516.

The Magistrate Judge concluded that Dr. Conolly's failure to discuss discrepancies among various test scores and his opinions created internal discrepancies within the province of the ALJ to resolve. In addition, the ALJ determined that Dr. Connolly's opinion was consistent with the finding that Plaintiff can perform simple work and make simple work-related decisions, and he accounted for that in his RFC.

Dr. Gerwell

The ALJ summarized Dr. Gerwell's psychological consultative evaluation at Tr. 34. Dr. Gerwell's exam notes state that "Mr. Pearce appeared to be able to concentrate adequately," that he "appeared to have mild difficulty concentrating adequately," and that he "can understand, carry out and remember instructions both complex and two-step" and "can fairly sustain concentration." Tr. 665. She also found, "He cannot persist in a work-related activity at a reasonable pace. He cannot maintain effective social interaction on a consistent and independent basis with supervisors, co-workers, and the public, or deal with normal pressures in a competitive work

setting." Tr. 667.

The ALJ assigned her opinion "partial weight" in his analysis, stating that although she found Plaintiff could understand, carry out and remember instructions both complex and two-step, "additional evidence shows that the claimant would not be able to understand, remember and carry out complex work." Tr. 41. The ALJ assigned a more restrictive mental RFC than Dr. Gerwell in this regard, finding Plaintiff could understand and follow simple instructions and directions; perform simple tasks with or without supervision; and maintain attention/concentration for simple tasks. His work needed to be limited to simple tasks involving only simple, work-related decisions, with few, if any, work place changes. Tr. 28.

The ALJ also found, "The objective evaluation of the claimant does not support Dr. Gerwell's opinion that the claimant could not carry out work activity at a reasonable pace." Tr. 41. The ALJ did not directly explain why he afforded her opinion partial weight, but he noted that according to Dr. Gerwell's report, Plaintiff maintained a stable pace when completing tasks. Tr. 34 (citing Tr. 665) (Dr. Gerwell's observation that Plaintiff "appeared to be able to concentrate adequately and he maintained a stable pace"). Because "the objective evaluation of [Plaintiff] does not support Dr. Gerwell's opinion that [Plaintiff] could not carry out work activity at a reasonable pace," the ALJ discounted that portion of her opinion. Tr. 41. Thus, the Government argues, because Dr. Gerwell's own findings on exam contradicted her functional capability assessment, the ALJ properly discounted a portion of her opinion. Tr. 41.

State agency consultants

The ALJ also addressed the opinions of the reviewing physicians Kavitha Reddy, M.D., Thomas Geary, Ph.D., Sandip Sen, M.D., and Charles K. Lee, M.D. (Tr. 41, citing 75-89, 91-107). State agency medical consultant's RFC assessments may constitute substantial evidence

supporting the ALJ's findings when combined with the ALJ's review of the record and Plaintiff's testimony. The ALJ afforded their opinions partial weight, but found Plaintiff was more limited by his impairments than the reviewing physicians determined. Tr. 41. The ALJ gave "partial weight" to the medical consultants because he found that "additional evidence received at the hearing level, including the hearing testimony, support that [Plaintiff] is more limited by his impairments than was previously determined." Tr. 41. However, their opinions provide further support for the ALJ's finding that he could perform a restricted range of sedentary work.

The ALJ properly fulfilled his role as factfinder in considering all of the opinion evidence, and the other evidence of record in determining Plaintiff's RFC, and the Court finds no reversible error. The ALJ permissibly discounted Dr. Connolly's opinions concerning Plaintiff's inability to concentrate based on other observations and test results within Dr. Connolly's report and elsewhere in the record, such as Dr. Gerwell's finding of only mild restrictions in concentration. The Court agrees with the Magistrate Judge that the ALJ was not substituting his own medical opinion in place of the experts, but was resolving conflicts and discrepancies within the entire medical record, as he is permitted to do. The ALJ properly resolved the evidence and limited Plaintiff to non-complex, simple work. With regard to the ALJ's rejection of Dr. Gerwell's conclusions about Plaintiff's ability to maintain pace, the Magistrate Judge pointed out that Plaintiff's difficulty in completing tasks observed by Dr. Gerwell appeared to be physical and not mental, and that Dr. Gerwell observed that Plaintiff maintained a stable pace when completing tasks. Plaintiff has not submitted any evidence that he would be unable to mentally or physically maintain the required pace for the jobs that the ALJ found that Plaintiff could perform. Accordingly, on this record, the Court must affirm.

### 3. **Plaintiff's Subjective Complaints**

Plaintiff argues that the ALJ failed to properly assess his subjective complaints under SSR 16-3p because he provided no explanation as to how the intensity and persistence of Plaintiff's symptoms, as testified to under oath, were contradicted by the record. Plaintiff primarily complains that the ALJ discounted Plaintiff's evidence that he could not sit comfortably for more than 20-30 minutes and would need to change positions from sitting to standing frequently, which the VE testified would preclude the jobs that the ALJ found Plaintiff could do.

Under SSR 16-3p, the ALJ must first "consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain." Second, the ALJ must "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms" such as pain and determine the extent to which an individual's symptoms limit his or ability to perform work-related activities. In considering the intensity, persistence, and limiting effects of an individual's symptoms, the ALJ must examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record. They will also consider the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

The regulations further state, "We will explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions. We will evaluate an individual's symptoms considering all the evidence in his or her record… The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id*. at *8-9.

The ALJ thoroughly discussed Plaintiff's medical records. The ALJ found that Plaintiff's lumbar degenerative disc disease and obesity were severe impairments. Tr. 24. There is no listing impairment for obesity, and the ALJ noted that he considered Plaintiff's obesity and functional limitations in accordance with Social Security Ruling 02-1p. Tr. 24. He noted that obesity in combination with other impairments may or may not increase the severity or functional limitations of other impairments, but that he would make no assumptions in this regard, and instead evaluated obesity in the context of the overall record evidence in making the RFC determination. *Id.* The ALJ also considered whether Plaintiff satisfied Listing 1.04 in regard to his spinal disorder, but found that he did not. *Id.*

In discussing the medical evidence, the ALJ recognized that Plaintiff complained of lower back pain and had medical evidence of mild multilevel degenerative spondylosis in early 2015. Tr. 28. The ALJ noted that in August 2015 Plaintiff showed degenerative changes in his spine, especially at L4 vertebrae, and was prescribed hydrocodone. Tr. 29. The ALJ cited additional records from August 2015 showing continued lower back pain with no improvement from medication or physical therapy, as well as lower back pain that radiated down his legs if he continued to sit for extended periods of time, difficulty being a passenger in a car for more than 30

minutes at a time, and a diagnosis of lumbar sprain. Tr. 30. The ALJ noted continued pain radiating down the legs in October 2015, a diagnosis of lumbar sprain, and the results of a lumbar MRI showing multiple lesions throughout the lumbar and thoracic spine, as well as the sacrum and pelvis, of unknown etiology. Tr. 31.

The ALJ noted the records from an October 31, 2015 visit with Dr. Perez where Plaintiff continued to complain of lumbar pain, and cited notes from Dr. Perez that the pain was likely due to cancer rather than injury. Tr. 32. The ALJ cited notes of continued back pain in January 2016, some improvement to lower back pain with physical therapy in February 2016, and reports that physical therapy aggravated his back pain in April 2016. Tr. 33-34. The ALJ noted that Plaintiff reported continued low back pain with tenderness in July 2016 and was referred for pain management for possible trigger point injections. Tr. 35. The ALJ also cited August and September 2016 records showing continued low back pain and a diagnosis of chronic pain syndrome, low back pain, and lumbosacral spondylosis; Plaintiff was prescribed new pain medication and facet blocks were recommended. Tr. 36-37.

The ALJ noted that Plaintiff underwent facet blocks in October 2016 that were successful in treating the pain (80% reduction in his lumbar pain immediately post-procedure), but that the pain returned after the local anesthesia wore off; Plaintiff also reported that the new pain medication Norco was helping to relieve his low back pain and allowing him to walk more. Tr. 38. The ALJ cited records showing that Plaintiff was seen in December 2016 for a follow-up of low back pain, and it was noted that Norco was no longer covered by the insurance, so he was restarted on Tizanidine, and facet rhizotomy and ablation were recommended. Tr. 37. The ALJ noted that Plaintiff continued to report low back pain in March 2017, and was considered to have reached MMI with a 14% whole person impairment. The ALJ noted that Plaintiff was seen in June 2017 for

low back pain follow up, with pain rated at 8/10, and facet blocks were again recommended. Tr. 992. Notes state that Plaintiff was "lost to follow up" due to his workers' comp insurance, but his lumbar pain previously responded well to the bilateral lumbar facet blocks, and facet blocks were recommended. Tr. 992. At the hearing, Plaintiff testified that his insurance would not cover the ablation or pain medication, and he was no longer taking it. He also testified that he cannot sit for long periods of time without pain and has to get up and stretch or change positions.

The ALJ expressly followed the two-step procedure in SSR 16-3p. Tr. 38. The ALJ acknowledged Plaintiff's testimony that he cannot sit long while watching television, that his doctor recommended a procedure to help with the back pain, but it was not covered by insurance, and that he is able to sit 15-20 minutes before he needs to stand up, and that he needs to lie down every day for 2-3 hours. Tr. 39. The ALJ stated that Plaintiff's medically determinable impairments could be expected to cause some of his symptoms, but that the statements of the intensity, persistence, and limiting effects of the impairments were not entirely consistent with the medical evidence and other evidence in the record "for the reasons explained in this decision." *Id.*

In his analysis, the ALJ noted that Plaintiff was diagnosed with lumbar sprain and had some tenderness to his lumbar spine, but "only mild limitation of range of motion" and that claimant "generally ambulated with a normal to wide gait, but did not require the use of an assistive device." Tr. 30. The ALJ noted that Plaintiff reported 80% improvement in his lumbar pain following facet block, and that ablation was recommended but Plaintiff testified it was not covered by worker's comp. Tr. 40. The ALJ stated that he considered Plaintiff's lumbar spine disease and obesity in limiting Plaintiff to less than the full range of sedentary work.

Plaintiff argues that the regulations require more from the ALJ than a broad finding that "statements concerning the intensity, persistence, and limiting effects of these symptoms are not

entirely consistent with the medical evidence and other evidence in the record" and the ALJ merely provides a boilerplate statement followed by a summary untethered to any specific symptoms, without addressing how or even if it contradicts Plaintiff's claims. And Plaintiff primarily complains that the ALJ failed to address why he did not credit Plaintiff's testimony that he can only sit for about fifteen to twenty minutes before he experiences pain and needs to get up and his constant need to change positions up and down. Tr.63. Plaintiff notes that he has well-documented lumbar pain, documented by an MRI that showed multiple lesions, and treated with physical therapy, facet blocks, and narcotic medication, that his treating physician noted that he was having a hard time being a passenger in a car for more than thirty minutes, and that sitting was consistently noted as difficult in the medical records, his function reports, and his sworn testimony. Tr. 63, 224, 244, 815, 914, 951, 986.[4] Plaintiff further notes that the severe nature of his obesity affects his pain while sitting, and there is no evidence that Plaintiff's obesity was adequately accounted for when addressing his pain and the need to change positions throughout the day.

The ALJ asked the VE about his proposed RFC and the VE listed the available jobs that the ALJ eventually found. The ALJ then added in an additional limitation of if he were to add a "sit-and-stand option," so that the same individual should be able to sit down for 2-3 minutes after standing for 30 minutes and stand for 2-3 minutes after sitting for 30 minutes, could the individual perform those same jobs, and the VE unequivocally stated, "No, he could not." Tr. 73. The VE also

---

4 Plaintiff's medical records do demonstrate that Plaintiff has had problems with prolonged sitting at times. E.g., Tr. 30. And at the hearing, when asked why he could not do his past work, Plaintiff stated, "One, well, I can't do the hours, the sitting and the standing." Tr. 59. When asked about a simple job where he could change positions, he stated he could not do it because of his back. Tr. 60. He testified that he watched television, but "I can't sit and watch a whole lot of it. I have to get up and move around or go lay down." Tr. 61. He testified that workers' comp denied the prescribed treatments for the back pain, as well as his back pain medication. Tr. 62. He testified again later that he can sit 15 to 20 minutes before it starts hurting but if he was not allowed to stand, he would "live through it" as he was doing at the hearing. Tr. 62-63. He testified that at home, he must get up and stretch his back after about 15 minutes, and it was constant "up and down." Tr. 63.

stated there were no other jobs at the sedentary level with the sit-and-stand option that the hypothetical individual could perform. Tr. 73. Plaintiff argues that, if his need to change positions was credited it would have resulted in a disability findings per the testimony of the VE. In summary, Plaintiff argues that the ALJ provided no articulable reason for not including a sit/stand option despite substantial evidentiary support.

The Government argues that "Plaintiff's assertion that the ALJ's subjective symptom analysis is inconsistent with SSR 16-3p lacks merit." The Government argues that the ALJ properly considered Plaintiff's pain complaints, but noted that treatment was effective in diminishing Plaintiff's pain such that it was not disabling. Tr. 39. The ALJ considered Plaintiff's diagnosis of obesity and found it to be a severe impairment, but observed the evidence showed Plaintiff was "successful with weight loss due to dietary changes" and explained that he considered obesity related limitations in determining that Plaintiff had an RFC for a limited range of sedentary work. Tr. 40. In discounting his complaints, the ALJ compared Plaintiff's complaints to the objective evidence showing MMI and 0% or 14% impairment, his use of conservative treatment, the effectiveness of his medications, his regular reported activities, and his lack of mental health treatment other than outpatient medication management. Tr. 27-40. The Government contends that because the ALJ's symptom analysis comports with the relevant guidelines, Plaintiff's reliance on his properly-discounted pain complaints to refute his RFC finding is misplaced.

The Magistrate Judge concluded that the ALJ complied with SSR 16-3p in all relevant respects by following the two-step process required by the Ruling. The ALJ identified Plaintiff's medically determinable impairments and reviewed in detail Pearce's testimony as well as all medical records and opinions. He then determined that while Pearce's "medically determinable

impairments could reasonably be expected to cause some of the alleged symptoms[,]" Pearce's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." Tr. 39.

Plaintiff has not filed objections to this portion of the Magistrate Judge's report and recommendation, and thus the Court need determine only whether it is clearly erroneous. Plaintiff contends that the type of broad statement made by the ALJ is no longer permitted with the new regulation. However, in addition to recounting all of the medical evidence before making the statement, the ALJ conducted an analysis to support that statement. Although the ALJ did not specifically address why he was rejecting Plaintiff's testimony that he would need to alternately sit and stand, his analysis can be determined by his recounting of Plaintiff's activities, medical evaluations, and the fact that past treatment had proved relatively effective. The Magistrate Judge's conclusion that the ALJ properly evaluated Plaintiff's subjective complaints is not clearly erroneous.

The Court is sympathetic that Plaintiff is suffering from pain, but the record demonstrates that the pain can be substantially alleviated through treatment, which Plaintiff is apparently currently not receiving due to it being refused by workers' comp insurance. However, for pain to be considered disabling for social security disability purposes, it must be unresponsive to treatment, and the evidence here shows that Plaintiff's pain is responsive to treatment. In *Brown v. Barnhart*, 372 F. Supp. 2d 957, 973 (S.D. Tex. 2005), the district court considered a similar situation, stating,

> The Court does not doubt that Brown suffers from pain; however, the records do not support a finding that Brown's pain is constant, unremitting, and wholly unresponsive to therapeutic treatment. Despite his allegations of constant

pain, Brown testified that he did not want to continue taking the trigger point injections in his back because "[t]hose are painful shots. And I'd rather have my surgery than to keep taking those." Brown testified, however, that he has not had back surgery because his insurance has expired. Brown has presented no evidence that he tried to seek, but was denied, indigent health care during this time frame. *See Riggins v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (claimant must demonstrate that he attempted to receive indigent health care) (*citing Murphy v. Sullivan*, 953 F.2d 383, 386–87 (8th Cir. 1992) (it is inconsistent with the degree of pain and disability asserted where no evidence exists that claimant attempted to find any low cost or no cost medical treatment for alleged pain and disability)). As such, the ALJ's conclusion that Brown's alleged limitations and symptoms were not credible is supported by substantial evidence.

*Id.* (some citations omitted). Similarly, although the facet blockers, ablation, and pain medication may not be covered by workers' comp, Plaintiff has not shown that he has attempted to obtain other insurance that might cover these procedures and medications, that he has sought indigent treatment, or that such treatments are financially impossible.[5] Thus, on this record, the Court must affirm.

### Conclusion

The recommendation of the Magistrate Judge is ACCEPTED and the decision of the Commissioner to deny disability insurance benefits is AFFIRMED.

The Clerk is directed to CLOSE this case.

SIGNED this 21st day of January, 2020.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

5 *See Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987), ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling. If, however, the claimant cannot afford the prescribed treatment or medicine, and can find no way to obtain it, 'the condition that is disabling in fact continues to be disabling in law.'"). *See also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (without evidence that plaintiff would be disabled with or without treatment, ALJ could properly consider the lack of treatment as an indication of nondisability, even if due to indigence).